UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:15-CR-0240-B |
| | § | |
| MARIAMMA VIJU (01) | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Mariamma Viju's Motion to Enforce Plea Agreement in Case 3:13-CR-00279 for the Benefit of the Defendant (Doc. 45). For the reasons that follow, the Court **DENIES** the Motion.

### I.

### BACKGROUND

This is a health care fraud case in which the United States (the "Government") has accused Defendant Mariamma Viju ("Viju") of (1) submitting fraudulent health care claims to Medicare and Medicaid, and (2) improperly disclosing individually identifiable health information. Doc. 1, Indictment ¶¶ 17–30. Viju now moves to dismiss her indictment, arguing that her husband's plea agreement in another case arising out of the same events precludes her prosecution.

In 2014, Viju's husband, Viju Mathew ("Mathew"), pled guilty to one count of fraud and related activity in connection with identification documents, authentication features, and information. Doc. 45, Def.'s Mot. to Enforce Plea Agreement 1–2 [hereinafter "Plea Ag. Mot."]; Factual Resume, *United States v. Mathew*, No. 3:13-CR-0279 (N.D. Tex. Oct. 22, 2014), ECF No. 47; R. & R. Concerning Plea of Guilty, *United States v. Mathew*, No. 3:13-CR-0279 (N.D. Tex. Nov. 25, 2014), ECF No. 51. The Court accepted his plea in early 2015. Order Accepting R. & R. of the

U.S. Magistrate Judge Concerning Plea of Guilty, *United States v. Mathew*, No. 3:13-CR-0279 (N.D. Tex. Jan. 8, 2015), ECF No. 52.

In the instant motion, Viju argues that the Government and Mathew's attorneys formed an oral plea agreement in Mathew's case, described as a "gentlemen's agreement," whereby the Government promised not to indict Viju "for the matters that gave rise to [Mathew's] indictment" in exchange for his guilty plea. Doc. 45, Plea Ag. Mot. 1–2. For its part, the Government steadfastly disputes that it ever made such a promise, pointing out that Mathew and his counsel acknowledged at Mathew's guilty plea hearing that there was no plea agreement between the parties and that Mathew himself—while under oath at his rearraignment—told the court the Government had not promised him anything to induce his guilty plea. Doc. 46, Gov't's Opp'n to Def.'s Mot. to Enforce Plea Agreement 2–9 [hereinafter "Gov't Opp'n"]. The Government further supports its argument with e-mail exchanges between the parties, which confirm the Government's firm refusal during the plea negotiations with Mathew to agree to any concessions with respect to Viju.

For the reasons that follow, the Court denies the motion, finding, as a threshold matter, that Viju lacks standing to challenge Mathew's plea agreement. As well, Viju otherwise failed meet her burden of proving breach of the alleged agreement.

## II.

## LEGAL STANDARD

The Supreme Court has recognized that disposing of charges via plea agreements is both "essential" and "highly desirable" in the criminal justice system. *Santobello v. New York*, 404 U.S. 257, 261 (1971). But to realize the benefits of plea deals, there must be "fairness in securing agreement between an accused and a prosecutor." *Id.* A key safeguard of this fairness is that, when a defendant

pleads guilty in exchange for a promise from the prosecutor, the prosecutor must fulfill that promise. *Id.* at 262; *United States v. Harper*, 643 F.3d 135, 139 (5th Cir. 2011) ("The Government must strictly adhere to the terms and conditions of its promises in a plea agreement.").

When alleging breach of a plea agreement, the defendant must prove the facts underlying the alleged breach by a preponderance of the evidence. *Harper*, 643 F.3d at 139. But whether the government's conduct amounts to a breach is a question of law for the court. *Id.* Assuming there was a plea agreement, the court must decide "whether the Government's conduct was consistent with the defendant's reasonable understanding of the agreement," construing the agreement strictly against the Government. *United States v. Purser*, 747 F.3d 284, 290 (5th Cir. 2014). In the event of a breach, two remedies are available: specific performance of the plea agreement or withdrawal of the plea. *Santobello*, 404 U.S. at 263; *Harper*, 643 F.3d at 139. The trial court has discretion to determine the proper remedy. *See Santobello*, 404 U.S. at 263.

### III.

### ANALYSIS

After reviewing the evidence and the parties' arguments, the Court concludes that Viju's Motion fails for two reasons: first, Viju lacks standing to enforce any plea deal that Mathew might have made; and, even assuming *arguendo* that Viju had legal standing to raise the issue, she presented insufficient evidence that a plea deal ever existed between her husband and the Government regarding her prosecution.

A.   *Viju Lacks Standing to Enforce a Plea Agreement Between Her Husband and the Government*

The Court must first address the threshold issue of whether Viju even has standing to enforce a plea deal to which she was not a party. Although plea agreement case law is rife with references to

contract law, there is no definitive answer as to whether the latter's rules regarding third-party beneficiaries apply to plea deals. Some courts have expressed doubt that a third party has standing to enforce a plea agreement. *See, e.g., United States v. Lopez*, 944 F.2d 33, 37 (1st Cir. 1991); *Santobello v. United States*, Nos. 94 CR. 119, 97 Civ. 4404, 1998 WL 113950, at *3 (S.D.N.Y. Mar. 13, 1998); *United States v. Bascue*, No. CR 92-169, 1993 WL 513246, at *8–9 (D. Or. Dec. 9, 1993). Others disagree, albeit in dicta. *See, e.g.*, *United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000); *United States v. CFW Constr. Co., Inc.*, 583 F. Supp. 197, 202–03 (D.S.C. 1984). Without clear guidance, the Court will conduct its own analysis, looking to the nature of the right and its relation to contract law.

    1.    <u>The Right to Enforce a Plea Deal: A Constitutional-Contractual Hybrid</u>

The right to enforce a plea deal originated in the Constitution, but has since taken on contractual aspects. As a result, both constitutional and contract law principles influence the interpretation of the right.

    *i.*    *The constitutional genesis of the right*

In *Santobello v. New York*, the Supreme Court upheld a criminal defendant's right to enforce a plea agreement when the defendant's "plea rests in any significant degree on a promise or agreement of the prosecutor." 404 U.S. at 262. This right is meant to ensure "fairness in securing agreement between an accused and a prosecutor." *Id.* at 261. Other such safeguards include the right to counsel when pleading, the right to have the court "develop, on the record, the factual basis for the plea," and the right to have any promises that induced the plea disclosed. *Id.* at 261–62. All pleas must also be voluntary and knowing. *Id.* at 261.

Although *Santobello* did not explicitly categorize the right to enforce a plea deal as constitutional, its status as such can be inferred. In its opinion, the Supreme Court situated the right among other requirements with constitutional origins: the right to counsel during a plea agreement derives from the Due Process Clauses, *Moore v. Michigan*, 355 U.S. 155, 159 (1957), as do the requirements that a plea be knowing and voluntary, *McCarthy v. United States*, 394 U.S. 459, 466 (1969), and that the court develop a factual basis for a plea on the record, *Boykin v. Alabama*, 395 U.S. 238, 242–44 (1969).[1] Subsequent cases have followed suit. *See, e.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357, 362 (1978). Furthermore, the Court has cited *Santobello* for the proposition that "[t]he requirements of due process have guided this Court in evaluating the promises and conduct of state prosecutors in securing a guilty plea." *Ricketts v. Adamson*, 483 U.S. 1, 13 (1987). The constitutional pedigree of the right to enforce plea deals is thus clear.

    *ii. The influence of contract law*

Identifying the right's constitutional origin does not, however, end the inquiry. Although *Santobello* does not mention contract law, in the intervening years, federal courts have come to regard plea agreements essentially as contracts. *See United States v. Newbert*, 504 F.3d 180, 185 (1st Cir. 2007); *United States v. Salcido-Contreras*, 990 F.2d 51, 52 (2d Cir. 1993); *United States v. Isaac*, 141 F.3d 477, 481 (3d Cir. 1998); *United States v. Jordan*, 509 F.3d 191, 195 (4th Cir. 2007); *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013); *United States v. Randolph*, 230 F.3d 243, 249 (6th Cir. 2000); *Andreas*, 216 F.3d at 663 (7th Cir. 2000); *United States v. Olesen*, 920 F.2d 538, 541 (8th

---

[1] The other right that the Court mentioned—disclosing the terms of a plea agreement—is statutory. Fed. R. Crim. P. 11(c)(2). But *Santobello* arose out of a state conviction, which Rule 11 would not control. Therefore, there must have been some other basis for the right to enforce a plea deal.

Cir. 1990); *United States v. Alcala-Sanchez*, 666 F.3d 571, 575 (9th Cir. 2012); *United States v. Bunner*, 134 F.3d 1000, 1003 (10th Cir. 1998); *United States v. Rubbo*, 396 F.3d 1330, 1334 (11th Cir. 2005); *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995). The Supreme Court itself has acknowledged that "plea bargains are essentially contracts." *Puckett v. United States*, 556 U.S. 129, 137 (2009). The result is a hybrid right, constitutional in nature but often contractual in practice.

The analogy to contract law is convenient, but it is important to note that, while "[p]lea agreements are *like* contracts . . . , they are not contracts." *Oleson*, 920 F.2d at 541. Thus, contractual principles do not always apply. *Id.*; *see also Puckett*, 556 U.S. at 137 ("[T]he analogy may not hold in all respects . . . ."). Indeed, "special public-interest concerns" can justify departures from the normal law of contracts. *United States v. Bryant*, 750 F.3d 642, 649 (7th Cir. 2014). *Santobello* itself is a prime example. There, the Supreme Court refused to engage in a harmlessness analysis, finding that the breach of the plea agreement alone warranted remand for resentencing or, alternatively, withdrawal of the plea. 404 U.S. at 262–63; *see also Purser*, 747 F.3d at 291–92. This outcome runs counter to ordinary contract law principles, which distinguish between total and partial breach to determine the remedy available to the injured party. Restatement (Second) of Contracts §§ 236 cmt. b, 243(4). Instead of tying the remedy to the severity of the defendant's injury, the Supreme Court decided that relief should be based on the mere fact of breach.[2]

Although *Santobello*'s deviation benefitted the defendant, other departures have done the opposite. In *United States v. Zweber*, for example, the Ninth Circuit refused apply the doctrine of

---

[2] To be sure, *Santobello* imposes a materiality requirement to obtain relief for a breach of a plea agreement. 404 U.S. at 262. But materiality is only one factor in determining whether a contractual breach is total or partial. *See* Restatement (Second) of Contracts § 243 cmt. e. The materiality requirement is thus not a proxy for the total/partial breach distinction.

mutual mistake to relieve the defendants from their guilty pleas. 913 F.2d 705, 711 (9th Cir. 1990). "Analogies to contract law in this setting are not perfect," the court stated, and "defense counsel are not entitled to rely on the government's good faith misunderstanding of the law as a basis for relief." *Id.* Thus, the court refrained from applying a well-known contract doctrine, even though its application would have helped the defendants.

        *iii.*     *Synthesizing the right to enforce plea deals*

These cases demonstrate that fairness to the defendant, rather than strict adherence to the law of contracts, is the touchstone for delimiting the contours of the right to enforce plea deals. *Cf. United States v. Johnson*, 979 F.2d 396, 399 (6th Cir. 1992) ("Although plea agreements are contractual in nature, . . . a defendant's underlying right of contract is constitutional, and therefore implicates concerns in addition to those pertaining to the formation and interpretation of commercial contracts between private parties."). In *Santobello*, the government gained an unfair advantage by inducing the defendant to forfeit his constitutional rights, only to deprive him of the benefit of doing so. By contrast, the government achieved no such advantage in *Zweber*, where all parties were operating under the same mistaken understanding of the applicable law. The result was "unfortunate," but not unfair, and so importing the doctrine of mutual mistake was not necessary to protect the fair bargaining process to which the defendants were entitled. 913 F.2d at 711.

Applying this rule, the Court concludes that third-party beneficiaries have no contractual right to enforce plea agreements. The right to enforce a plea deal does not exist for its own sake; rather, it is a means to achieve fairness in plea bargaining. *See Santobello*, 404 U.S. at 261. This does not mean that a court may refuse to enforce a broken plea deal as long as it is satisfied that the bargaining process was nonetheless fair. *See Maryland v. Craig*, 497 U.S. 836, 862 (1990) (Scalia, J.,

dissenting) (criticizing reasoning that "abstracts from the right to its purposes, and then eliminates the right"). But in deciding whether to *extend* a right, a court should determine whether the extension would further the right's purpose. *Cf. Waller v. Georgia*, 467 U.S. 39, 46–47 (1984) (holding, after examining the purpose of the right, that the Sixth Amendment right to a public trial extends to suppression hearings). Here, allowing third-party beneficiaries to enforce plea agreements would not further the right's purpose of ensuring fair plea bargaining. Where the defendant himself can obtain relief from a broken plea deal, enforcement by third parties adds nothing to protecting the defendant's right. Accordingly, Viju may not enforce her husband's plea deal as a third-party beneficiary.

        2.       <u>Viju's Constitutional Standing to Enforce Mathew's Plea Agreement</u>

Because Viju has no contractual right to enforce her husband's plea agreement, she is essentially attempting to enforce his constitutional rights. To do that, Viju must meet the constitutional requirements for third-party standing. She does not.

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). There is an exception, however, when the litigant meets three requirements: (1) she has "suffered an 'injury in fact,' thus giving . . . her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) she is closely related to the third party whose rights she seeks to enforce; and (3) there is "some hindrance to the third party's ability to protect his . . . own interests." *Id.* at 410–11.

Even assuming *arguendo* that Viju fulfills the first two requirements, she falters on the third because nothing suggests that Mathew cannot enforce his own plea deal. If he believes that the

Government has violated his plea agreement, he is free to seek relief from the Court. But Viju cannot, because she has presented no evidence that there "exist[s] some hindrance to" Mathew's ability to protect his own interests.

B.  *Viju Has Otherwise Failed To Show that the Government Agreed Not to Prosecute Her in Exchange for Mathew's Guilty Plea*

As mentioned above, even if Viju had legal standing to contest her husband's plea agreement, her efforts would be unavailing. Viju bears the full burden of demonstrating facts that establish a breach of the alleged plea agreement by a preponderance of the evidence. *Harper*, 643 F.3d at 139. The Court held a day-long evidentiary hearing on Viju's Motion on October 20, 2015. At the hearing, five witnesses, including Mathew's defense attorneys, William McMurrey ("McMurrey") and Derek Staub ("Staub"), testified for Viju. Four witnesses testified for the Government, including the AUSA assigned to Mathew's case, Brian Portugal ("Portugal"), and his supervisor, Jay Dewald ("Dewald"). The Government's case agent, Tiffany Smith, from the U.S. Department of Health and Human Services, Office of Inspector General, also testified. The Court had an ample opportunity at the hearing to observe the witnesses for both sides and assess their demeanor and credibility.

It is notable that, compared to many situations involving allegations of breach of a plea agreement, the Court is not called upon to interpret the nuances of a written plea agreement because no such writing exists in this case. Nor does the analysis require the Court to discern the parties' intent with respect to a purported oral agreement between them, as the Government maintains that there was no oral agreement. So the simple question for the Court to resolve here is: did the parties ever agree to forgo the prosecution of Viju in exchange for Mathew's guilty plea? This inquiry, in turn, calls upon the Court to determine which of two competing versions of the events surrounding

the plea discussions is more credible. And at the close of the evidentiary hearing, the Court was left with a firm belief that the Government had the more believable version of events and that Viju failed to establish that a plea agreement even existed between the parties, let alone that there was a breach.

First, and as mentioned, there is not one scrap of physical evidence that supports McMurrey's and Staub's claims that Dewald and Portugal ever agreed not to prosecute Viju; no written plea agreement, no e-mail exchange, no letters or written notes, no audio or video recordings—nothing. What tangible evidence does exist on the topic—e-mails between Portugal and Staub and the rearraignment transcript—contradicts McMurrey's and Staub's claims. The e-mails demonstrate that Portugal consistently rejected all efforts by Mathew's defense counsel to even discuss Viju with them. *See, e.g.*, Doc. 46-2, Gov't Opp'n, Ex. 2, Email 1–2. The rearraignment transcript shows that McMurrey and Mathew, when directly questioned by the court about possible plea agreements or promises, denied that there was any plea agreement between the parties or promises made to Mathew to induce his guilty plea. Evid. Hr'g Tr. 63–64, 193–96;[3] Rearraignment Transcript, *United States v. Mathew*, No. 3:13-CR-0279 (N.D. Tex. Oct. 7, 2015), ECF No. 83, at 13, 15 [hereinafter "Rearr. Tr."].

Inconsistencies in McMurrey's and Staub's testimony about the formation of the purported agreement further erodes their credibility. Staub testified that he thought he and the Government had reached an agreement not to prosecute Viju on September 26, 2014 after the exchange of e-mails with Portugal, stating "we came to a resolution in the e-mails." Evid. Hr'g Tr. 32–35, 64–65. He said they later "summed [the oral agreement] up" at the October 14, 2014, meeting. Evid. Hr'g

---

[3] All citations to the transcript of the October 20, 2015 hearing on Viju's Motion are to the rough transcript provided by the court reporter.

Tr. 34–35, 65. Curiously, Staub stands by this rendition of events with no supporting documentation and despite Portugal's consistently firm refusal—documented in the September 26 e-mail exchange and by testimony from both sides—to discuss Viju at all with Staub. In short, Staub's e-mail exchange with Portugal flatly contradicts his testimony that he thought there was an agreement after this exchange. Not only that, Staub's recollection was inconsistent with lead defense counsel McMurrey's testimony on the timing of the alleged agreement as to Viju. In contrast to Staub's testimony, lead defense counsel McMurrey initially testified that there was *no* agreement as to Viju prior to the October 14, 2014, meeting.[4] *Id.* at 93–102, 149. It was for that reason, McMurrey recounted, that his "mission" going into that meeting was to obtain such an agreement. *Id.* at 96–97. Later in his testimony, Murrey did an about-face on that point and stated that as of September 26, 2014, "I think there was an agreement" to not prosecute Viju, and that they needed to "shore up that *final agreement*" at the October 14 meeting. *Id.* at 143–45 (emphasis added). The fact that Staub and McMurray gave inconsistent versions of events regarding the centerpiece of the Motion—that the Government orally agreed not to prosecute Viju—materially undermined their credibility.

Further, Staub and McMurrey's testimony that Dewald intervened at the October 14, 2014, meeting and approved an oral arrangement not to prosecute Viju strains credulity. First, if they had an agreement going into the meeting as they claim, it makes little sense that they would have needed Dewald's intervention in the first place. That Dewald, as Portugal's supervisor, would accede to such

---

[4] McMurrey specifically testified that going into the October 14, 2014, meeting, his "mission" "was to find out whether they would not charge the wife." Evid. Hr'g Tr. at 97. Later, McMurrey testified that the October 14, 2014, meeting—when he alleges Dewald agreed not to prosecute Viju—was the "first time" a promise had been made by the Government not to prosecute Viju. *Id.* at 149.

an arrangement when, as both sides testified, he thought such plea deals unethical,[5] makes little sense. And it makes even less sense given McMurrey and Staub's testimony that, although Dewald refused to enter into a formal agreement not to prosecute Viju on ethical grounds, he nonetheless *sua sponte* suggested an approach that amounted to an under-the-table "gentlemen's agreement" not to prosecute. Dewald vehemently denies this, and both Portugal and Agent Tiffany Smith corroborated his denial with credible testimony. McMurrey's and Mathew's subsequent disavowal of any plea agreement at the rearraignment hearing further supports Dewald's testimony on this point.

Finally, and perhaps most damaging to McMurrey and Staub's version of events, is what occurred at the rearraignment hearing before Magistrate Judge Toliver when McMurrey denied that there was any plea agreement in the case and remained mute when the Mathew told Judge Toliver—while under oath—that he had not been promised anything in exchange for his guilty plea. *Id.* at 114–15; Rearr. Tr. at 13, 15. McMurrey testified that he did not disclose the purportedly key oral arrangement between the parties (i.e., the "gentlemen's agreement") because he did not think he had to. Evid. Hr'g Tr. 114–15. This, despite the fact that this purported agreement was, in McMurrey's words, the primary motivation for Mathew's plea.[6] That McMurrey, a highly experienced former prosecutor and criminal defense attorney, would testify that he thought he did not have to disclose the "gentlemen's agreement" is troubling to say the least and runs counter to settled

---

[5] Whether an agreement to forbear prosecution of a third-party is unethical or unconstitutional is not the issue here. Such arrangements can be permissible if approached with caution and good faith. *See United State v. Nuckols*, 606 F.2d 566, 569 (5th Cir. 1979).

[6] McMurrey specifically testified that Mathew's motivation to plead guilty was the alleged promise not to prosecute Viju. Evid. Hr'g Tr. 157–58.

authority on the requirements for a Rule 11 plea colloquy. When a guilty plea "rests in and significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello*, 404 U.S. at 262. But to enforce that right, the promise inducing the plea must be disclosed on the record. Fed. R. Crim. P. 11(c)(2); *see also United States v. Arbuckle*, 390 F. App'x 412, 417–18 (5th Cir. 2010). Measured against this authority, McMurrey's testimony that he did not think he had to disclose the alleged "gentlemen's agreement" does not withstand scrutiny.

Furthermore, if there was in fact a "gentlemen's agreement," it is hard to conceive why McMurrey did not take advantage of this one opportunity to hold the Government's feet to the fire as to the arrangement by telling the court on the record that the agreement existed. By doing so, he could have accomplished the goal of either sealing the deal with the Government on the record or, if the Government balked, refusing to go forward with the guilty plea.

In sum, the credible evidence supports the Government's theory of the plea negotiations.[7] Thus, if Viju had standing to enforce Mathew's alleged plea agreement, she would not prevail on the merits.

## IV.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Viju's Motion to Enforce Plea Agreement in Case 3:13-CR-00279 for the Benefit of the Defendant. The Government's prosecution may proceed.

---

[7] Although Mathew himself also testified at the hearing, the Court did not find him credible. The Court made this determination based in part on his significant interest in the outcome and his testimony that McMurrey's representations regarding the "gentlemen's agreement," which the Court also found not credible, heavily influenced his own understanding of it. Evid. Hr'g Tr. 177.

SO ORDERED.

SIGNED: January 11, 2016.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE